18-12-19 United States of America v. Patrick Roy Wandahsega Arguments not to exceed 15 minutes per side. Ms. Freeman for the appellant. Your Honors, may it please the Court, my name is Claire Freeman and I represent Mr. Patrick Wandahsega in this matter. I would like to reserve four minutes for rebuttal, if I may. All right. And without kind of delving into hyperbole or becoming maudlin this morning, I want to start out by returning to Justice Scalia's words 30 years ago in Coyote, Iowa, that we cannot gainsay, the state or any of us cannot gainsay, the value of face-to-face confrontation and the value of respecting our bedrock constitutional guarantees. While they may upset this, respect for these guarantees may upset the rape victim or the abused child, they may also undo that malevolent adult who's coaching a child or the person who's making up a story against the accused. And while I understand the tension that we feel and I feel empathy for the difficulty in these situations, when the accusations are as serious as they were in this matter, we had one count of aggravated sexual abuse of which Mr. Wandahsega was acquitted and one count of abusive sexual contact of which he was convicted by a jury. Again, we have that tension of the rights of the accused versus these children that come forward. And in this case, we have an avalanche of error, not just a few. But, I mean, on the confrontation point, I mean, I certainly understand your argument. I understand your argument that Crawford seems to be analyzing these issues in a categorically different way than Craig did. But yet the Supreme Court has not overruled Craig. And, I mean, aren't we just without authority to hold that Craig doesn't, you know, that Craig's invalid? Well, Your Honor, I think that a few things have happened even since this Court's Cox decision in the years intervening. I think we've seen a further erosion. But just that erosion itself, I think, implies that the courts don't need to blindly follow Craig or can impose sort of a lower standard or just fall back on it. I think that, if anything, it simply heightens the scrutiny, even if Craig remains good law. We have a higher standard of scrutiny now for any 3509 requests. Here we have three issues under 3509, the first being challenging the closed-circuit television as a whole. Certainly it's suggestive of guilt and I think undermines our adversarial system. Then we have the case-specific findings here where we have equivocal evidence at best of the fear or trauma that HDW would have suffered. And then we have the issue of expertise and a social worker, a master's level social worker, stepping in where 3509G2D absolutely speaks of a psychiatric or psychological opinion. So not only doctoral but an MD opinion for the psychiatric aspect. So I think, given the erosion of Craig, we absolutely have to up the ante. I understand. But, I mean, just to be precise about it then, I mean, Craig, correct me if you think otherwise. Craig seems to govern the Sixth Amendment issue. The statutory issue is another matter. That's what you're just speaking to. But, I mean, as to the confrontation issue, the Sixth Amendment issue, I just, I mean, as a lower court judge, I just don't see how we can get by Craig. I think it's sticky. But, again, 3509, obviously, and the court doesn't need me to tell you this, but it flows directly from Craig. Craig flows directly from Roberts. And Crawford eviscerated, pardon me, but the colloquialism would yieldress. I get the logic. I get the logic. But, you know, the court just hasn't done it. But, again, I think that still there's that undermining. So, I would at least ask for, not to misuse the term, but a stricter scrutiny here of the findings of the district court. Let me ask you this. The magistrate judge found it was appropriate to use the closed circuit television for the, well, he was eight years old at the time he testified. There was no objection to the magistrate's report and recommendation, was there in this case? No. I understand that. Why, therefore, is this whole argument not waived? I don't believe it is waived. And, first, we've got Smith, which this court did say that despite a lack of objection to a report and recommendation, they would consider the issue in that case, which was a civil case, in full, and they did. But we also have, I'd say, given the tension between Craig and Crawford, a potential complete miscarriage of justice here, especially under the expertise issue where the statute is pretty clear that we need that doctoral degree. And this court's precedent under Cox, Moses, and the rest have looked for doctoral training for these experts. Is there any substantive shortfall or deficiency you see in the social worker's testimony as opposed from the, you know, pedigree, so to speak? Yes. I mean, I think first and foremost in that one is her blanket assertion that children under 10 should not be testifying. I think that even though the magistrate judge said that he was finding a case-specific finding on the matter, that that blanket assertion, which she made repeatedly, undermines her case-specific consideration of the matter, as well as her one-time meeting with HDW, as opposed to, say, in Cox, where we had a therapist meeting continually with the two minors training to be a doctor or to obtain a doctoral degree and putting in countless hours with the children. HDW, we had one meeting, and we had, frankly, a biased social worker who just feels young children shouldn't testify. So those would be the substantive errors that I would fall back on most heavily, along with the training issues. I also think that we hit on the matter of she very much points out the mood swings, the in capricious, the blank staring off into space as symptoms of this alleged abuse, but we have the trauma that HDW suffered beforehand of seeing his mother die in front of him, of having an alcoholic father he doesn't want to live with, and a concession by the social worker that these alleged symptoms could have and did arise prior to any allegations of abuse. So her falling onto those symptoms as a potential demonstration of the trauma he would suffer, I think, is very much undermined here. From the CCTV issue, I would also just point out on the waiver issue that there was no acquiescence. It was fully briefed, both in terms of the substance of the practice as a whole, in terms of the expertise of the social worker, and in terms of her finding before the magistrate judge. It was fully and compellingly presented by my colleague at the Defender's Office, and we don't have an issue as we did in Capel where there is an acquiescence at all. So while there was no objection to the report and recommendation, it was an objection lodged, later counsel under the CJA panel continued to express displeasure with the CCTV setup. And so I think from sort of a judicial economy standpoint, which is one of the things that we saw in Smith as a consideration, we don't lose any economy here by continuing to consider the matter. Moving on from the CCTV issue to the hearsay issues, I think that, again, we go back to Capel. It's very clear that this alleged medical diagnosis hearsay of the identity of HDW's alleged abuser is absolutely not for a medical diagnostic purpose, which Capel says it has to be for diagnostic purposes. Whether or not we follow exactly the Eighth Circuit's ideas in Turning Bear about sort of the self-interest of giving- Well, wasn't some of the evidence that it was for medical treatment, that the child was brought to the hospital for medical treatment and was talked to in that context? I guess I find it hard to buy into that, Your Honor, simply because we have a police officer accompanying this child and his family. The visit is motivated by the authorities telling them to go to the hospital. And we have a doctor who doesn't conduct any physical exam of the child. And I understand the doctor saying, okay, well, it's been 72 hours. We're probably not going to find evidence. I find that very difficult to believe, given other cases where- But the child was there for medical treatment. I would contest that, Your Honor. I just think that the presence of that police officer and the motivating factor being that the authorities told the family to go in undermines any claim that this is purely for medical treatment. But that isn't what Dr. Judy or Nurse Smith said. Pardon? Dr. Judy and Nurse Smith testified, didn't they? And they said they were doing a triage, the nurse said. Yes, but again, I think in that case their actions spoke louder than words. I mean, I think it's very easy after the fact for these medical professionals to want to defend their actions. And I think there is some, I'll use the word bias here, of against who wants to let an alleged sex abuser go. These medical professionals wanted to defend these alleged admissions they received. And yet again, Dr. Judy did no physical exam. And I would say from evidence in other cases, even 72 hours of passage, I think that physical evidence could have been collected depending on things like anal fissures and things. So I find it very, I'm somewhat incredulous that these medical professionals were asking these questions purely for diagnostic purposes when they didn't diagnose. Your standard is what, we have to find an abusive discretion? For the admission of the hearsay evidence, yes. Yes, Your Honor. Why do you think, I mean, what's your sense of why there wasn't an exam? I mean, I assume you don't think the medical providers were in some kind of conspiracy to railroad somebody here. I mean, why don't they do it? I thought it was strange. Your Honor, and I understand what Dr. Judy said about not wanting to cause the child more trauma. But to me that feels like, again, sort of ignoring that tension of that role that that doctor played here. I understand wanting to be gentle with a young child. But I think that doctor abdicated his role as a medical professional, honestly. And whatever his motivation for that, to help HDW or so forth, it just shows an abdication of his responsibilities as, again, a medical professional. Frankly, I was surprised that nothing was conducted. Your Honor, I see my time is almost up. I will return for rebuttal. Thank you. Thank you. Good morning, and may it please the Court. My name is Austin Hakes, and I represent the government. Perhaps a good place to begin is where we left off, which is this 8034 exception, through which hearsay statements to Nurse Smith and Dr. Judy were admitted. Those statements were appropriately admitted by the district court in this case. I think that the fact that there wasn't further intravenous examination of HDW actually shows that the doctor was concerned for medical treatment. If the physician had been on some sort of quest for evidence, if he was just an instrument of the police trying to uncover any medical evidence of a crime, perhaps he would have turned over every leaf, so to speak, in trying to find evidence of, as counsel has pointed out, anal fissures or something like that. But in this case, it was expressly because he was concerned with preserving the well-being of the child and finding out what sort of medical care that the child needed that he decided not to continue with any intravenous examination of HDW in this case. Do we know whether any care was actually rendered, apart from, you know, talking and examining? I mean, was anything done, any treatment? So, yes, Your Honor. They did have a, they performed a test for, I believe it was gonorrhea and syphilis, just to determine if he had any sexually transmitted infections. But in this case, after talking with HDW and telling him, you know, I really would like to check and see if you have any sort of anal injuries, HDW repeatedly told the physician, no, that would, I don't want you to do that. And I think the physician correctly determined that it would re-traumatize the child. I think the physician also correctly determined that, given that HDW had told him that while he experienced pain through the initial invasion, there wasn't any further evidence of bleeding and he wasn't experiencing any pain at the moment. And that was a sufficient basis for the doctor to conclude, well, there's not really an urgent or imminent medical reason to go invading this young boy's body, especially given that it appears he may be suffering some sort of emotional or psychological trauma based on what happened to him. So, again, what this indicates in this case is that the doctor was performing a medical examination and was talking with HDW for medical purposes. And thus, the district court appropriately admitted those statements and allowed the jury to evaluate them in rendering its verdict in this case. As the court has acknowledged, this court is bound by precedent. And in the case of United States v. Cox, this court had occasion to expressly address any apparent tension between Crawford and Craig. After wrestling with that tension, the court decided unanimously that Craig was still good law and that it governed this issue of CCTV testimony of child complaining witnesses and sexual assault cases. And that ruling binds the court in this case here as well, despite the concerns that were carefully outlined by Judge Sutton in his concurrence in Cox. Craig is good law. And in this case, the district court made appropriate findings that allowed the CCTV procedure to be used. Although the social worker who testified did make a statement that she believed it was always traumatic for children under age 10 to testify, she also gave a lot of detailed and specific information about this specific child to the court. She explained that HDW had disclosed to her that he would be scared all the way around the world, scared and scared up to space if he had to testify in front of his father. And then furthermore, the judge actually interviewed HDW himself and confirmed that in fact the child would experience significant fear of his father if he were to testify. Now importantly, 3509 doesn't require expertise for a finding of fear. It requires expertise for a finding of trauma. And in this case, the judge found that there was both evidence that the child could not testify because of fear and that he would experience trauma in this case. The expert, though a social worker, was significantly qualified. The rule does not require a specific psychological degree in order to qualify as an expert under 3509. She had dealt with hundreds of other cases of alleged sexual assault of minors, and she had literally written a book about the types of trauma that children often experience after this type of abuse. She had furthermore previously testified in other cases as an expert on this issue, and so she was an appropriate person to evaluate in this case whether HDW would experience trauma as a result of testifying or be unable to testify as a result of fear. Your Honor, I'm happy to answer any other questions the Court has. I just have one on a topic that wasn't brought up by defense counsel yet. You know, the special agent, what is it, Fortunato, is that the way you pronounce it? Yes, Your Honor. His testimony, you know, that they've objected, he was asked a question about, you know, and were you aware or were you not before you even went to the defendant's house that he had a significant drinking problem? And his answer was he knew about a prior incident where Wanta Saiga had passed out and engaged in a homosexual act. Now, the district court found that was responsive to the question. I don't see how that's responsive to the question. He was asked about were you aware the defendant had a significant drinking problem, and he blurts out, well, he passed out and engaged in a homosexual act. Now, why isn't that the grounds for a mistrial? Well, perhaps looking at the question in isolation, it would seem nonresponsive, Your Honor. But the theme, in fact, the central theme of defense counsel's cross of Agent Fortunato was the extent of Mr. Wanta Saiga's drinking problem. Viewed in that context, I think the district court correctly determined that after repeated inquiry into how bad of a drinker was Mr. Wanta Saiga, the FBI agent correctly interpreted defense counsel's question and made the comment that he did. But furthermore— I don't follow that. I mean, can you spell that out? I don't get it. So I think because they had been so— Defense is emphasizing his alcoholism. Yes, Your Honor. All right. So then defense counsel, you know, to some extent one might argue it's invited, but defense counsel asked this question. So how in context is it responsive or whatever? They're talking about a specific interview, Your Honor. Right. I've been through the circumstances of, you know, all that was disclosed in that interview with a specific focus on how much of a drinker was Mr. Wanta Saiga. Right. Also during that interview is where it was Mr. Wanta Saiga had disclosed about this prior instance. Right. So I think the FBI agent reasonably interpreted after asking about all this other stuff, if he's still asking me this question, it must be that he's wanting me to say this other thing that also came up in this interview. And so responded, hey, I was aware that he had been drinking and there was a circumstance that involved a homosexual act. But as the court has pointed out, I think this is truly invited error in this case. After that one brief comment, defense counsel moved on to another topic, but then on recross opened with a foray into this alleged homosexual act and wanted the FBI agent to develop what it was that had happened, thereby bringing the attention to this statement to the jury again. And then it was only after that that there was a sidebar where defense counsel mentioned that he would like a mistrial. The defense counsel did not avail itself of the remedy which the court offered, which was, hey, we can have a stipulation where we strike this from the record. And that would have been a powerful and sufficient remedy if, in fact, that comment about a homosexual act was error. It is no small matter to have a district court tell the jury to disregard. I mean, counsel had a good reason. I mean, you can understand where counsel is coming from on that when they just said, let's just leave it alone. I mean, they were worried about kind of just focusing or reminding the jury or whatever. I understand, Your Honor, but the defense counsel also seemed to want to have his cake and eat it too. On the one hand, he didn't want to re-remind the jury of it, and so he declined this striking option. But on the other hand, he seemed to want to re-remind the jury of it because in approaching the witness on recross, he explicitly opened the door to this issue, amplifying it in the jury's mind. Your Honor, if the court has no other questions, I'll rest on the brief and submit the case. All right. Thank you. Your Honors, I think a good place for me to start in rebuttal is on the homosexual remark. And I think we all appreciate how difficult it is to make those spur-of-the-moment, on-your-feet decisions at trial. And my colleague in the lower court, I think, did his best to clean up the mess that the special agent had created by injecting, I think intentionally, this extremely inflammatory remark. Because this isn't in the context of drinking. This is in the context of a case involving allegations of homosexual sexual abuse of a child. And it was completely not responsive to questions related to drinking. It was responsive of nothing that had been posed. I don't even, well, I mean, it just doesn't even make any sense on its own terms. But how does one pass out and then do something? Absolutely. And on that, too, I think just very quickly segueing into the Rule 29 issue and the insufficiency of the evidence, I would say that there was no expert testimony on the ability to black out and still form intent, even if you can have action. So I would just hit on that very quickly. I'd like to see that report. So on that homosexual remark, I would just fall back on Lawrence and this court's discussion of Bajorona Montenegro. But people's adult consensual sexual practices, marriage, having children, that's not fair game. It's certainly not fair game to insert into an adversarial proceeding where exactly that sort of issue of homosexual contact is at issue. What about the recross, though? Again, I think it was trying to clean up the spilled milk that the government had injected into it and then the decision not to ask to strike because it would have been futile. It's not part of the record. I have talked to my colleague about it, and, again, I can completely understand the tension that trial counsel faces in trying to remedy what really amounted to a due process violation. As we presented in the briefs, I mean, we had a due process right here to a fair trial, and we had a special agent jumping up to thwart that with personal sexual contact between adults. I want to hit on just a few other matters in rolling into it from the homosexuality, the cumulative error here. I think that we can't ignore the fact that we have the guilt suggestive CCTV testimony of the alleged victim. We have this hearsay evidence coming in both from the medical professionals and from these two women who very much had bias against my client and had demonstrated, including in custodial proceedings with the grandmother and my client, and very much an axe to grind to obtain custody of this child. She had already obtained the grand jury. The jury did get to make that judgment about those biases. I understand, but I do think that undermines any sort of reliability analysis under Rule 807, as Techia from the Seventh Circuit that I cite in the reply brief goes into. But again, the cumulative error here, and we've got someone who's allegedly the sexual monster out on the street for another nine months before the government indicts him. Again, I just find some of that a little bit difficult to countenance. I want to hit very quickly on the sentencing issues, most specifically Kent, as cited in the Rule 28J letter of my colleague for the government yesterday. Kent never addressed the issue of indigency under Section 3006AA. At all times in the lower court, Mr. Wondesega was represented by appointed counsel, and I think that changes the indigency equation very significantly here because we have an indigence finding and we have binding statutory law relating to indigence in that case, which Kent did not address. And as to the acquitted conduct, we have the DNA transference studies, the unreliability of child testimony studies, and the idea that everybody has come out, the ALI, the ABA, the states, against use of acquitted conduct. It's simply the U.S. Sentencing Commission that's lagging with a scar across our constitutional system of justice. Thank you, Your Honors. Thank you very much. The case is submitted.